**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ : | | |
| ERIC O. SMITH, | : | |
| | : | |
| Plaintiff | : | CASE NO.: 1:18-cv-01906 |
| | : | |
| v. | : | |
| | : | COMPLAINT AND |
| GILEAD SCIENCES, INC. | : | JURY DEMAND |
| | : | |
| Defendant. | : | |
| _____: | | |

**COMPLAINT**

1.      Plaintiff, Mr. Eric O. Smith, by and through undersigned counsel brings this personal injury action against Defendant Gilead Sciences, Inc. ("Gilead") and alleges as follows:

**STATEMENT OF THE CASE**

2.      Plaintiff Eric O. Smith is HIV negative. Mr. Smith was prescribed and began taking Truvada in 2016, as part of a pre-exposure prophylaxis treatment program known as PrEP.

3.      Like most antiretroviral medications, Truvada works to prevent the human immunodeficiency virus (HIV) from replicating within the body. In an HIV-infected patient, preventing replication of the virus helps reduce transmission rates and benefits the patient's immune system. In an HIV-negative individual, Truvada can help lower that person's risk of becoming infected with HIV.

4.      Mr. Smith took Truvada for PrEP from early 2016 through 2018. He took the pill daily, as prescribed, and trusted it would help reduce his risk of contracting HIV without severe risk to his health.

1

5.      Unknown to Mr. Smith and his medical providers, Truvada's developer and manufacturer, Gilead, had long known that Truvada's active ingredient, tenofovir disoproxil fumarate (TDF). suffered from low bioavailability and had to be ingested at high doses in order to provide the promised antiviral and preventative effect.

6.      Truvada's low bioavailability and high dosage meant that Mr. Smith's body would be required to process large amounts of the drug before it could reach the needed concentration level of tenofovir (the drug's active compound) in Mr. Smith's blood and plasma sufficient to reduce the risk of HIV infection.

7.      The high required dosage also meant that Mr. Smith's kidneys and bones received daily overexposure to the extremely potent and active form of the drug. Such overexposure was not needed to reduce Mr. Smith's risk of contracting of HIV, but, rather, resulted from the excessive amounts of Truvada that his body could not process. The remaining potent and toxic medication instead ended up in Mr. Smith's bones and kidneys.

8.      Long before Truvada was approved as PrEP for uninfected individuals, Gilead knew of TDF's shortcomings. Indeed, since Gilead began developing TDF for treatment of HIV infection in the late 1990s and early 2000s it knew about its low bioavailability and resulting need for high doses to be effective. Preclinical toxicity studies showed kidneys and bones to be the target organs for toxicity.

9.      And yet, with full knowledge of TDF's toxicity, Gilead failed to adequately warn Mr. Smith or his doctors of his risk for bone mineral density loss, bone fractures and/or bone breaks. Truvada's original label downplayed the toxicity studies and suggested only that doctors "consider assessment of" bone mineral density "in patients with a history of pathologic fracture or

other risk factors for osteoporosis or bone loss." The label provided no warning for patients without a history of fracture or bone problems.

10.    Mr. Smith was only 37 years old at the time he began taking Truvada. He had no history of fractures, was not at risk for osteopenia, and did not have risk factors for osteoporosis or bone loss.

11.    Had Mr. Smith's doctors known that Truvada presented a risk of bone mineral density loss, bone fractures and/or breaks in patients without any related history, they would have recommended a different prevention strategy, monitored his bone mineral density, or decided not to prescribe the medication.

12.    Gilead not only knew and failed to adequately warn of Truvada's risks to Mr. Smith's bones, it also intentionally withheld a safer and more effective design of the drug in order to maximize monopoly profits.

13.    Long before Gilead began selling Truvada for the treatment of HIV infection in 2004, Gilead had discovered and tested a similar form of the drug that could be given in lower doses with reduced toxicity to kidneys and bones. But, an improved form of the drug would have undercut Gilead's sales of Truvada for treatment of HIV infection, its first combination-pill entry into a crowded class of nucleotide analogue reverse transcriptase inhibitors (NRTIs). And, Gilead was counting on Truvada—along with its parent drug Viread—to grow its market share and continue to set it apart from the pack of pharmaceutical companies with similar offerings.

14.    Sales of Truvada and its parent drug Viread would eventually lead Gilead to a $40 billion market capitalization and a quadrupling of its profits since 2004, to over $5 billion in 2009 and over $10 billion in 2015. The safer and more effective design Gilead had discovered, tested, and then rushed to provisionally patent, was shelved until Gilead had exhausted the profits it could

earn from Truvada.

15.     Gilead's decision to withhold a more effective and safer design, along with their failure to warn, exacted a high price for Mr. Smith and caused severe bone mineral density loss resulting in catastrophic fractures and breaks in his arm.

16.     Although he had never once in his life broken a bone, in January 2018, at the age of 39 and after less than two years of treatment with Truvada for PrEP, Mr. Smith's bones had degraded so drastically that a simple fall resulted in multiple fractures, and a broken forearm that tore through his skin. Mr. Smith required surgery and the insertion of metal plates and screws to repair his broken arm.

17.     Had Gilead released Truvada in the safer and more effective design, Mr. Smith, and countless other HIV-negative individuals could have been spared years of unnecessary bone and kidney toxicity, bone mineral density loss, bone breaks and fractures.

18.     Had Gilead adequately warned Mr. Smith or his providers about the risk of bone mineral density loss, bone fractures and/or breaks, Mr. Smith's medical providers would have made a different prescribing decision and/or monitored Mr. Smith's bone mineral density.

19.     Mr. Smith's bone mineral density loss and resulting fractures, breaks, and surgery at only 39 years old are a direct and proximate result of Gilead's wrongful conduct in designing, developing, manufacturing, testing, distributing, labeling, advertising, marketing, promoting, and selling an unreasonably unsafe prescription drug, Truvada.

20.     Mr. Smith brings this action to recover medical and other expenses and all general and special damages related to his development of bone mineral density loss, arm fracture, break, and resulting surgery, and for general and specific future damages, and such other relief as requested herein for injuries suffered as a direct result of Mr. Smith's ingestion of Truvada. At all

times pertinent, Plaintiff used Truvada in a manner and dosage recommended by Gilead and prescribed by his doctor.

## **PARTIES**

21.     Plaintiff Eric O. Smith is a life-long resident and citizen of the District of Columbia. Mr. Smith was prescribed and ingested Defendant's antiviral medication Truvada from June 2016 through 2018. As a result of taking Truvada for PrEP, and although he had never once broken a bone, Mr. Smith suffered rapid and extensive bone mineral density loss and by early 2018 his bones were so frail that he shattered his right arm in multiple places and so badly broke his bones that they pierced through his skin. Mr. Smith required surgery to heal his shattered arm. The surgery resulted in multiple metal plates and screws being inserted into Mr. Smith's right forearm and has greatly impacted his life. He suffered a great deal of pain during and after the surgery. He was forced to take time off from work and school. Mr. Smith continues to suffer from pain and reduced enjoyment of life from his arm break and surgery and will continue to suffer in the future.

22.     Defendant Gilead Sciences, Inc. is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 333 Lakeside Drive, Foster City, California 94404. Gilead is a pharmaceutical company that develops and commercializes prescription medicines, including Truvada for PrEP, which were prescribed for and ingested by Plaintiff. Gilead was founded in 1987 by Michael L. Riordan, at the time a 29-year-old medical doctor interested in developing antiviral medications after he contracted dengue fever while working in the Philippines. Gilead's head of research and development, John C. Martin, a chemist and entrepreneur, became the CEO in 1996, a position he maintained until late 2016.

23.     Defendant Gilead regularly conducts business within the District of Columbia and derives substantial revenues from drugs consumed in the District of Columbia. At all times relevant

to this complaint, Gilead was engaged in the business of manufacturing, promoting, marketing, distributing, and selling pharmaceutical drugs, including Truvada and Truvada for PrEP, which is distributed throughout the District of Columbia.

**JURISDICTION AND VENUE**

24.     Jurisdiction is conferred upon this Court by 28 U.S.C. § 1332 because full diversity of citizenship exists between the parties. Defendant is incorporated and has its principal place of business in states other than the District of Columbia, the district in which Plaintiff resides. Further, the amount in controversy as to the Plaintiff exceeds $75,000, exclusive of interest and costs.

25.     This Court has supplemental jurisdiction over the remaining common law and state claims pursuant to 28 U.S.C. § 1367.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within the District of Columbia.

**FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

27.     Plaintiff Eric O. Smith (Plaintiff or Mr. Smith) was prescribed and ingested Defendant Gilead's antiviral medication, Truvada from 2016 through 2018. Plaintiff took Truvada as part of "a pre-exposure prophylaxis treatment program" ("PrEP") designed to reduce the risk of HIV infection in HIV-negative, sexually active adults.

28.     Truvada is the brand name of "tenofovir disoproxil fumarate" ("TDF"), which is a prodrug of the compound tenofovir. A prodrug is an inactive form of medication that, once ingested and metabolized, is converted by the body into the pharmacologically active form of the drug being delivered.

29.     TDF is not the only prodrug form of tenofovir. TAF, tenofovir alafenamide, is

6

another prodrug form.

30.     Both TDF and TAF are taken orally and after absorption, the biologically-available tenofovir is passed into the blood.

31.     Because TDF suffers from low oral bioavailability, it must be given in much higher doses to obtain the required therapeutic effects and reduce the risk of transmission. TAF has superior bioavailability and achieves the needed therapeutic effects in doses that are a fraction of those required for TDF.

32.     Tenofovir, the active drug in both TDF and TAF, was initially synthesized more than thirty years ago by Antonín Holý at the Institute of Organic Chemistry and Biochemistry, Academy of Sciences of the Czech Republic in Prague. Dr. Holý was a long-time collaborator of Dr. Erik De Clerq, a medical doctor and researcher at the Rega Institute for Medical Research in Leuven, Belgium.

33.     In the mid-1980s, Dr. De Clerq, listed as one of the inventors of both TAF and TDF, often travelled to visit and conduct research at Bristol-Myers Squibb ("BMS") in Wallingford, CT. His host and then-BMS employee, John C. Martin, PhD, would later become the head of Research and Development at Gilead Sciences and recently-retired as Gilead's president.

34.     Dr. De Clerq has called his association with Drs. Holý and Martin the "Holý Trinity." "Tenofovir has been the lifetime achievement of the Holý Trinity, *i.e.*, Antonín Holý, myself, and John C. Martin." De Clerq, Erik, *An Odyssey in antiviral drug development—50 years at the Riga Institute: 1964-2014*, Acta Pharmaceutica Sinica B, Chinese Pharmaceutical Association, 2015;5(6):520-543.

35.     Dr. De Clerq describes TDF as "the most successful drug ever developed for the treatment of AIDS, and it owed its success to the ingenuity of the chemist, A. Holý, but also the

foresight of the industrialist, by chance also a chemist, John C. Martin, who brought it to the market, and the medical doctor (myself) who served as the go-in between." *Id.*

36.     In 1990 Mr. Martin left Bristol-Myers to become the head of Gilead's Research and Development. Focusing on how to combine HIV medications into fewer pills taken less frequently throughout the day, Mr. Martin, Gilead, and Dr. de Clerq discovered tenofovir among thousands of compounds they had licensed from Czech researchers.

37.     Gilead purchased the right to sell tenofovir in 1997.

38.     While a powerful antiviral medication, tenofovir was never considered a medical breakthrough and had to be administered intravenously. To be able to market and sell tenofovir, Gilead would need to develop prodrug formulations that could deliver the drug to the body in one pill and in a useable form.

39.     After testing various prodrug forms, sometime in 1997, Gilead had isolated and put both TDF and TAF through pre-clinical studies regarding their potency, efficacy, and cytotoxicity.

40.     Gilead's testing and research showed that TAF had "a 10-fold increase in antiviral activity relative to TDF and a 200-fold increase in plasma stability." "After 1 hour, [TAF] results in 10x and 30x the total intracellular concentration of [tenofovir]" as compared to TDF. "[TAF is] 2-3 orders of magnitude more potent than all other nucleosides or nucleotides."

41.     A 1998 Gilead study conducted on beagles to analyze the oral administration of TAF confirmed these results. The TAF given to the beagles "result[ed] in a ~21-fold increase in [tenofovir exposure] as compared to [TDF]."

42.     By July 21, 2000, more than a year before Viread (the first TDF-containing drug Gilead brought to market, and a predecessor and parent drug of Truvada) obtained FDA approval, Gilead submitted provisional patent applications to the U.S. and European patent offices

describing TAF, then called GS-7340, its enhanced uptake by target cells, reduced cytotoxicity, and superior stability and concentration compared to TDF. *See* United States Provisional Patent Application No. 60/220021; European Provisional Patent Application Number 01961695.2. The provisional patent applications cited Gilead research dating back to 1997 showing TAF was 2-3 times more potent than Truvada and that it could obtain concentrations of tenofovir in target cells that were ten to thirty times higher than those attainable with Truvada. "As shown, [TAF is] 2-3 orders of magnitude more potent than all other nucleotides or nucleosides."

43.     As TDF entered clinical trials, Gilead's scientists published research on TAF's superior profile:

a.   TAF "demonstrated good bioavailability" and rapid and efficient conversion into the active drug resulting in high concentrations of tenofovir in target cells.

b.   Because TDF "is highly susceptible to hepatic and blood esterases which limits its persistence in plasma and ability to interact directly with target cells," researchers "sought to overcome this limitation with the development of a prodrug [TAF] which is stable in blood."

c.   Levels of tenofovir in target cells after "incubation with [TAF] were about 10-fold and 30-fold greater than those after incubation with [TDF]."

d.   "[H]igh intracellular levels of [tenofovir] should be an important indicator of greater clinical efficacy of [TAF]."

44.     Gilead's research also showed that the TAF design was so efficient at delivering tenofovir to the body it was virtually undetectable as TAF after it had been metabolized. By contrast, TDF in its prodrug form remained detectable in plasma, a marker of potential toxic exposure to non-target cells and sites. TAF's greater efficiency would require much lower doses

of it to be effective.

45.     In May 2001, after demonstrating TAF's greater potency, concentration, efficacy, and bioavailability, Gilead submitted its TDF design under the brand name Viread to the FDA for accelerated approval under 21 CFR 314.108(b)(2).

46.     The approval process showed Gilead repeatedly defending TDF's weaknesses. The FDA repeatedly asked Gilead to conduct more studies and provide more data on TDF's toxicity to bones and kidneys, the FDA's Division of Antiviral Products at one point "stressed to the applicant [Gilead] that they should be forthcoming with all tenofovir data."

47.     Gilead submitted TDF for approval as Viread on the basis of two incomplete clinical trials conducted on treatment-experienced populations (i.e., patients who had received prior treatment for HIV infection with antiretroviral drugs). While animal toxicology studies demonstrated that bones and kidneys were TDF's target organs and that the toxicity caused decreased bone mineral density and osteomalacia, Gilead's clinical trials collected only limited data related to bone density and/or kidney function.

48.     In the course of pre-approval meetings for Viread, Gilead fought to have the FDA agree with its belief that "there is no evidence that tenofovir has a direct effect on bone." In contrast to Gilead's assertions, the FDA had documented sixteen bone fractures in clinical testing, and noted Gilead had documented fifteen. The bone fracture data was omitted from Viread's package insert.

49.     Viread was approved for sale on October 26, 2001.

50.     In November 2001, Gilead submitted an Investigational New Drug application (IND) for TAF to the FDA. IND No. 63737.

51.     Viread began almost immediately to take over the market for antiviral medications

treating HIV infection. Sales grew from $225 million in 2001 to nearly $4 billion in 2008.

52.     As Viread continued to corner the market, Gilead ignored the risks TDF continued to present and put its TAF design and research on the shelf to focus on promoting, selling, and making a profit from Viread and its successor TDF-based drug, Truvada.

53.     In April 2002, as prescriptions for TDF were growing along with Gilead's market share, Gilead's research continued to confirm TAF's diminished toxicity and TDF's risks to bone and kidneys. Yet, Gilead did not publish this research, did not conduct clinical trials of TAF, did not change its prescribing information, and did not instruct its sales representatives to begin informing doctors that the toxicities associated with TDF could be eliminated with a new, better drug.

54.     Gilead failed to take any of these steps because TDF sales were booming and Viread had begun to corner the market in antiviral treatments for HIV. Further, by keeping TDF as the focus of its antiviral offerings, Gilead knew it would reap future profits when it combined TDF with other patent-protected drugs to create newly-protected combination drugs that would prolong Gilead's ability to charge monopoly prices on all TDF-containing drugs.

55.     In late 2003, with full knowledge that TAF was a safer and more effective design alternative, Gilead prepared another application to the FDA for a TDF drug, Truvada—the first TDF-combination drug it would use to extend the profitability of its TDF patent.[1] At this time, Gilead's own clinical studies continued to show that TDF presented toxicity risks to kidneys and bones.

56.     Truvada, the medication Mr. Smith was prescribed, is a fixed-dose combination pill

---

[1] Truvada consists of three different fixed-dose combinations of tenofovir delivered as TDF combined with emtricitabine, a nucleoside antiviral.

consisting of TDF and emtricitabine, another NRTI developed by Gilead that had been approved for sale on July 2, 2003.

57.     Truvada for treatment of HIV infection was approved for sale on August 2, 2004.

58.     In spite of the clear and growing need to mitigate the risks associated with TDF, in October 2004, Gilead's CEO John C. Martin suddenly announced, "the company is discontinuing its development program" for TAF.

59.     Although Gilead withdrew TAF from clinical development and inactivated its IND for TAF, it continued its financial development of the compound and between October 2004 and May 2005, Gilead secured its interest in the superior prodrug through seven patent applications related to and covering TAF.

60.     As TAF sat protected on the shelf, Gilead continued to combine the inferior TDF with other drugs in order to further extend its monopoly profits and market share.

61.     On July 12, 2006, the TDF-combination pill Atripla was approved for sale. Atripla had over $2.2B in U.S. sales in 2015.

62.     In December 2010, as TDF's patent protection was running out, Gilead dusted TAF off the shelf telling investors about "an interesting new molecule" the company had added to its research and development plans. The "new molecule" was TAF, which Gilead synthesized as early as 1997 and tested as early as 2000.

63.     On August 10, 2011, the TDF-combination pill Complera was approved for sale. Complera had almost $800M in U.S. sales in 2015.

64.     On December 15, 2011, the TDF-combination pill Truvada was submitted to the FDA for the addition of a PrEP indication, which would enable doctors to prescribe the medication for HIV-negative adults as part of a program to reduce the risk for HIV infection in sexually active

adults.

65.     On July 16, 2012, the TDF-combination pill Truvada was approved for sale to HIV-negative adults as part of PrEP. Truvada, for both indications, earned over $2B in 2015.

66.     And on August 27, 2012, yet another TDF-combination pill, Stribild, was approved for sale. Stribild earned $1.5B in sales in 2015.

67.     Although it synthesized and put TAF through pre-clinical testing in the late 1990s, 2000, and 2001, submitted an NDA for TAF in 2001, and then patented it in 2004 and 2005, Gilead did not apply for approval from the FDA to sell a TAF-containing drug until November 5, 2014.

68.     Genvoya, Gilead's first TAF-containing drug, was not released for sale until November 5, 2015. Gilead's patent on Truvada was set to expire just more than a year later, in 2017.

69.     Genvoya is the TAF prodrug design of Truvada. But Gilead has not applied to the FDA for approval to sell Genvoya as PrEP. If Genvoya had a PrEP indication, Gilead's market for sales of Truvada for PrEP would likely disappear.

70.     Gilead's tactics have allowed it to reap outsized profits. In 2015, Gilead was able to earn 90% Non-GAAP Product Gross Margins. Gilead's tactics have led the New York Times to comment, "Gilead now is faced with figuring out *what to do with all the cash it is generating*."[2]

71.     Gilead's high profits come from the steep costs of its drugs. High prices of drugs such as Gilead's Viread ($10,848 per year) and Truvada ($18,456 per year) limit patient access either through exorbitant out of pocket-costs or co-pays, limitations in existing insurance, and rationing of these high-priced pills.

---

[2] Andrew Pollack, *Sales of Solvadi, New Gilead Hepatitis C Drug, Soar to $10.3 Billion,* NEW YORK TIMES (February 4, 2015) (emphasis added).

72.     In its 2015 earnings Guidance, Gilead stated that it anticipated spending between 2.8 and 3 billion dollars on research and development, while earning a profit of roughly 18 billion dollars.

73.     Not only did Gilead hide a safer alternative design in an attempt to push other designs out of the market, it also failed to adequately warn Mr. Smith and his doctors about the side effects associated with Truvada's toxicity.

74.     All TDF-containing medications have package inserts and labeling based on Viread's original package insert. Truvada for PrEP's package insert does not adequately warn of the risks of bone and kidney toxicity, chronic kidney disease, bone mineral density loss, bone necrosis, or fractures and breaks to patients without prior bone or kidney issues.

75.     TDF-related patient information sheets suffer from the same inadequacy and tell patients only that they should inform their doctor if they have pre-existing kidney or bone problems.

76.     No TDF package insert or patient information sheet warns of the risk for bone fracture or bone breaks in patients without pre-existing bone or bone mineral density issues.

77.     The 2016 Truvada for PrEP label approved at the time Mr. Smith first began taking it indicated potential issues for patients with prior or current bone and kidney problems, but failed to adequately warn Mr. Smith or his doctors of the risks to patients without any prior or current history of these problems.

78.     In addition to failing to adequately warn Mr. Smith or his doctors of the risks to bones and kidneys associated with TDF, Gilead has engaged in an extensive overmarketing campaign. As early as 2001, right after Viread's FDA approval, Gilead affirmatively and publicly misrepresented TDF's safety profile through its sales representatives and CEO, claiming that TDF

14

was a "miracle drug," had "no toxicities," was "benign," and "extremely safe."

79.     Gilead's CEO at the time, Dr. John C. Martin, would often refer to TDF as a miracle drug at sales meetings. He had previously stated that he believed Gilead needed to overcome the perception in the medical community that Viread was like Gilead's previous HIV drugs that would likely cause kidney damage.

80.     Even after Gilead was reprimanded by the FDA in 2002 and 2003 for falsely claiming TDF had no toxicities and bore no risk to a patient's kidneys or bones, Gilead continued to misrepresent the risks through its Viread prescription inserts and patient information sheets, which similarly downplayed the risks and misrepresented that toxicity, bone, or kidney damage was primarily a risk for patients with pre-existing kidney or bone issues.

81.     Gilead made these misrepresentations even though it knew TDF had a high potential for toxicity and loss of bone mineral density in all patients. In its early stages of development, TDF animal toxicology studies showed that the bones and kidneys were the target organs for toxicity and that the bone toxicities included osteomalacia and decreases in bone mineral density.

82.     Gilead knew that TDF toxicity led to kidney and bone damage, even in patients without pre-existing kidney or bone issues. Gilead had a duty to include a proper warning of the risks associated with the use of TDF in these patients. Instead, Gilead misrepresented the safety and benefits of TDF and failed to provide prescribing physicians and their patients, including Mr. Smith and his doctors, with the information they needed to safely and reasonably prescribe and take Gilead's drugs.

83.     Gilead had a duty to design Truvada for PrEP in a proper manner that was not unreasonably dangerous. Instead, Gilead designed Truvada for PrEP with the prodrug TDF, a

design it knew caused bone and kidney damage, so that it could maximize its profits and monopoly on TDF.

84.     Gilead's design of Truvada for PrEP with the prodrug TDF created an unreasonable danger the magnitude of which outweighed any cost or disadvantage of using the TAF design.

85.     Plaintiff seeks general and punitive damages and seeks to hold Gilead accountable for its malicious and profit-driven refusal to design Truvada for PrEP in a safe and effective manner.

## ACCRUAL OF THE CAUSES OF ACTION

86.     Plaintiff incorporates by reference each and every allegation made above, as if set forth fully here.

87.     Plaintiff did not know and could not have known that his bone mineral density loss and resulting bone fracture and break was caused by Gilead's actions and omissions related to the production, marketing, and selling of Truvada for PrEP, until January 2018.

88.     Additionally, Defendant's acts of fraudulent concealment alleged herein operated to equitably toll the applicable statute of limitations.

## COUNT ONE
## STRICT LIABILITY – DEFECTIVE DESIGN

89.     Plaintiff incorporates by reference each and every allegation made above, as if set forth fully here.

90.     At all times material to this action, Defendant was responsible for designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling its prescription drug Truvada for PrEP.

91.     Truvada for PrEP was expected to, and did, reach the intended consumers, handlers, and persons coming into contact with the product without substantial change in the condition in

which it was produced, manufactured, sold, distributed, labeled, and marketed by Defendant.

92.     Gilead had a duty to create a product that was not unreasonably dangerous and properly prepare Truvada for PrEP.

93.     Truvada for PrEP is defective in design and unreasonably dangerous because both before FDA approval and at the time it left Gilead's control, Gilead knew that a PrEP medication designed with TAF would be a similarly effective yet safer form of the drug, capable of preventing or reducing the risk of Plaintiff's bone mineral density loss, bone fractures and breaks.

94.     Truvada for PrEP is further defective in design and unreasonably dangerous because the magnitude of the danger associated with toxicity, bone mineral density loss, bone breaks, bone fractures, kidney damage and/or chronic kidney disease outweighed the costs and disadvantages associated with designing PrEP with TAF. Indeed, at the time Truvada for PrEP was approved in July 2011, Gilead had been developing TAF for more than a decade.

95.     Truvada for PrEP is further defective in design and unreasonably dangerous because when it left Gilead's control, it was more dangerous than an ordinary consumer would expect.

96.     Because Gilead designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product which created an unreasonable risk to Plaintiff's health, Gilead is strictly liable for Plaintiff's injuries.

97.     As a direct and proximate result of Truvada for PrEP's defective design, Plaintiff has suffered and will continue to suffer severe and permanent injury and/or damage.

**COUNT TWO**
**STRICT LIABILITY – FAILURE TO WARN**

98.     Plaintiff incorporates by reference each and every allegation made above, as if set forth fully here.

99.     Defendant researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, marketed, and/or introduced Truvada for PrEP into the stream of commerce, and in the course of the same, directly advertised or marketed Truvada for PrEP to consumers or persons responsible for consumers, and therefore, had a duty to both Mr. Eric O. Smith directly and his physician(s) to warn of risks associated the product's use.

100.    Defendant had a duty to warn of adverse drug reactions, which it knew or should have known could be caused by the use of Truvada and/or are associated with the use of Truvada for PrEP.

101.    The Truvada manufactured and/or supplied by Defendant was defective due to inadequate post-marketing warnings and/or instructions because, after Defendant knew or should have known of the risks of bone mineral density loss, bone fractures and breaks from Truvada for PrEP use, it failed to provide adequate warnings to consumers of the product, including Plaintiff and Plaintiff's physician(s), and continued to aggressively promote Truvada for PrEP as safe for kidneys and bones.

102.    Due to the inadequate warnings regarding the risk of bone mineral density loss, bone breaks, and/or bone fracture in patients without a history of bone problems, Truvada for PrEP was in a defective condition and unreasonably dangerous at the time that it left Defendant's control.

103.    Defendant failed to adequately warn Plaintiff and Plaintiff's prescribing physician(s) of human and animal results in preclinical studies linking TDF to bone toxicity and bone mineral density loss in patients with no prior bone issues.

104.    Defendant failed to adequately warn Plaintiff and his prescribing physicians of adverse bone and kidney events including, but not limited to, severe bone breaks and fractures in

patients without a clinical history or risk for bone mineral density loss, osteoporosis, or other bone or kidney issues.

105.     Truvada for PrEP was also defective due to inadequate post-marketing surveillance and/or warnings because, after Defendant knew or should have known of the risks of serious side effects to the bones and kidneys of patients without a clinical history of similar issues, it failed to provide proper warnings to Truvada's consumers and prescribing physicians and continued to improperly advertise, market, and/or promote Truvada as safe and effective for use as PrEP.

106.     Had Gilead properly warned Plaintiff of Truvada for PrEP's side effects, Plaintiff would not have purchased or taken the medication.

107.     Upon information and belief, had Plaintiff's prescribing physician(s) been properly warned of the potential side effects of the Defendant's Truvada for PrEP, Plaintiff's prescribing physician(s) would have discussed the risk of bone mineral density loss with Plaintiff, would not have prescribed it, and/or would have monitored Mr. Smith's bone mineral density.

108.     Gilead's defective design and improper warnings amounted to willful, wanton, and/or reckless conduct.

109.     As a foreseeable and proximate result of the aforementioned wrongful acts and omissions of Defendant, Plaintiff was caused to suffer from the aforementioned injuries and damages. Plaintiff has suffered and incurred damages including medical expenses and other economic and non-economic damages.

**COUNT THREE**
**BREACH OF EXPRESS WARRANTY**

110.     Plaintiff incorporates by reference each and every allegation made above, as if set forth fully here.

111.    Defendant, through its advertising and promotional materials expressly warranted that Truvada was safe for its intended use and for uses that were reasonably foreseeable. Truvada for PrEP did not conform to these express representations, including, but not limited to, the representation that Truvada for PrEP was well accepted in patient and animal studies, the representation that it was safe, and the representation that it did not have high and/or unacceptable levels of permanent bone mineral density loss, bone fracture, and/or bone breaks, and that it would reduce the risk of HIV infection without significant damage to the kidneys and bones of patients without a history of similar issues.

112.    These express warranties represented by the Defendant were a part of the basis for Plaintiff's use of Truvada for PrEP and Plaintiff and/or his physician relied on these warranties in deciding to prescribe and/or use Truvada for PrEP.

113.    At the time it made the express warranties, the Defendant had knowledge of the purpose for which the Truvada for PrEP was to be used and warrantied it to be in all respects safe, effective, and proper for such purpose.

114.    Truvada for PrEP does not conform to these express representations because it is not safe or effective and may produce serious side effects, including, among other things, bone mineral density loss, bone fracture, and/or bone breaks.

115.    Defendant knew or should have known that these representations and warranties were false, misleading, and untrue in that Truvada for PrEP was not safe and fit for the intended use, and, in fact, produced serious injuries to users that were not accurately identified and represented.

116.    As a result of the foregoing breach of express warranties Mr. Eric O. Smith was caused to suffer bone mineral density loss, bone fractures, bone breaks, and surgery, as well as

other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and any and all life complications caused by Plaintiff's injuries.

## COUNT FOUR
## PUNITIVE DAMAGES

117.    Plaintiff incorporates by reference each and every allegation made above, as if set forth fully here.

118.    Gilead's conduct, as described above, was extreme, outrageous, oppressive, fraudulent, and/or malicious. Gilead risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public in order to protect its monopoly profits and continue to corner the market for antiviral medication. Gilead made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Gilead made conscious decisions to withhold a safer and more effective design.

119.    Plaintiff is entitled to punitive damages because Gilead's wrongful acts and/or omissions were attended by circumstances of fraud, malice, or willful and wanton conduct, and done heedlessly or recklessly, without regard to consequences or the rights and safety of others, particularly Plaintiff. Such conduct includes, but is not limited to the following:

     a.  At all relevant times, Defendant knew of Truvada's defective nature, as set forth herein, but continued to design, formulate, manufacture, market, and sell the Truvada to maximize sales and profits at the expense of the health and safety of the consuming public, including Plaintiff, and in conscious disregard of the foreseeable harm caused by Truvada;

     b.  At all relevant times, despite its knowledge of the risk of toxicity, kidney damage,

bone mineral density loss, bone fracture and breaks associated with Truvada, Gilead failed to disclose these risks through marketing and promotional efforts and product labeling;

c.   At all relevant times, Gilead continued to promote Truvada as safe for use as PrEP in HIV-negative patients without a history of bone or kidney problems and failed to provide adequate warnings regarding these;

d.   At all relevant times, Defendant had knowledge of safer alternative designs for Truvada, including but not limited to a TAF design, and failed to substitute such safer design.

## DAMAGES

120.   As a result of Gilead's acts, omissions, and failures described herein, Plaintiff Eric O. Smith has sustained substantial injuries, permanent disability, and damages, including, but not limited to, severe and permanent bodily injury.

121.   As a result of his injuries, Mr. Smith has and will sustain the following nonexclusive damages: physical injuries; past, present and future emotional distress; loss of enjoyment of life; past, present and future mental pain and suffering; inconvenience; past, present and future physical pain, suffering and disability; past, present and future medical expenses; economic damages; and other damages to be proven at the trial of this matter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court enter an Order and Judgment against Defendant for:

a.   Compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-

economic damages in an amount to be determined at trial of this action;

b. Economic damages in the form of past medical and incidental expenses, out of pocket expenses, past and future lost earnings and/or loss of earning capacity, in an amount to be determined at trial;

c. Punitive and/or exemplary damages for Gilead's wanton, willful, fraudulent, and reckless acts and demonstrated complete disregard and reckless indifference for Plaintiff's safety and welfare, and that of the general public, in an amount sufficient to punish Defendant and deter future similar conduct and to be determined at trial;

d. Pre-judgment and post-judgment interest;

e. The costs of this action, including reasonable attorneys' fees; and

f. Granting any and all such other and further relief as the Court deems necessary, just, and proper.

## **JURY DEMAND**

Plaintiff hereby requests a trial on the merits by jury, pursuant to Fed. R. Civ. P. 38.


DATED: August 13, 2018                    Respectfully submitted,



*Attorneys for Plaintiff Mr. Eric O. Smith*